Filed 7/8/15  P. v. Syvertson CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SAMUEL E. SYVERTSON,<br><br>        Defendant and Appellant. | A140480<br><br>(Lake County<br>Super. Ct. No. CR930869) |

Samuel E. Syvertson was convicted of assault by means of force likely to produce great bodily injury, with a sentence enhancement for personal infliction of great bodily injury, and battery with infliction of serious bodily injury.  He contends the enhancement and the battery conviction must be reversed because he did not personally and directly inflict great bodily injury upon the victim.  Additionally, he urges the matter must be remanded for resentencing because the trial court arbitrarily failed to consider his mental illness as a mitigating factor.  We affirm.

**STATEMENT OF THE CASE**

Appellant was charged by information filed on May 1, 2013, with assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)).[1]  It was alleged that appellant personally inflicted great bodily injury upon the victim in the commission of the assault (§ 12022.7, subd. (a)), and that the offense was a serious felony within the meaning of section 1192.7, subdivision (c)(8), and a violent felony

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

1

within the meaning of section 667.5, subdivision (c)(8). Appellant was charged in count 2 with personally inflicting great bodily injury in the course of using force and violence upon the victim (§ 243, subd. (d)), and this offense was also alleged to be a serious felony (§ 1192.7, subd. (c)). It was further alleged that appellant had suffered a prior conviction for infliction of corporal injury on a spouse or cohabitant (§ 273.5) for which he served a prison term within the meaning of section 667.5, subdivision (b).

On October 30, 2013, the jury found appellant guilty as charged. Appellant waived jury trial on the alleged prior prison term, which the trial court found true.

On December 10, appellant was sentenced to the upper term of four years on count 1 and the upper term of four years on count 2, with the term on count 2 stayed pursuant to section 654. The court imposed an additional one year for the prior prison term (§ 667.5) and an additional three years for the infliction of great bodily injury (§ 12022.7), making the total term of imprisonment eight years.

Appellant filed a timely notice of appeal on December 10, 2013.

## STATEMENT OF FACTS

Appellant and his mother lived next door to Elton Eveningred on 29th Avenue in Clearlake, near the corner of Boyles; their homes were about five feet apart with a fence separating them. Appellant and his mother had previously lived with Eveningred, who had had a romantic relationship with appellant's mother for about a year. Eveningred testified that the relationship ended on good terms and he suggested she move into the rental house next door. Eveningred considered appellant and his mother friends of his, he had "help[ed] them with food," "got them into the house," and had given appellant work.

On the morning of June 1, 2012, Eveningred went to Wal-Mart to get a tarp to put on the fence between the houses in order to block the view of his property from appellant's. When he returned about 9:00 a.m., appellant was in the driveway. Appellant asked what the tarp was for and when Eveningred said it was "to put on the fence to separate the two properties," appellant's "eyes started to get angry" and he started to get upset. Eveningred testified that "his eyes went strange and he started dancing, you know, like and stood back a little. And I just turned around and said, 'I'm not going to deal with

2

this right now,' and I turned around and went to get my tarp." When Eveningred turned around, he saw "a glare, a flash," "kind of like a shiny object" or "reflection from the sun off of something." He was struck in the head but did not remember how many times. Asked if he remembered hitting the ground, Eveningred replied, "I remember getting off the ground." Asked if he was knocked out, he said, "Yes, ma'am. I mean, I guess I was." His neighbor Ron came and picked him up, and Eveningred asked him to wait for a minute because he could not hold himself up; he leaned against a car, and the police arrived after a few minutes. Eveningred saw his neighbor Stormi and her mother across the street. About 15 minutes after the police arrived, he looked over and saw appellant's mother in the front yard, saying, "What happened? What happened? What's going on?" Eveningred testified that he never raised a hand against appellant. He did not want to see appellant in trouble and denied having told appellant's mother that he wanted to see appellant spend a lot of time in jail.

When asked to describe his injuries, Eveningred testified, "I was hit in the head a couple of times and busted my head open. I guess they said my eardrum was broken and I won't be able to hear out of the ear no more." He had stitches for the cut above his eye. Asked whether he was struck in the ear, he replied, "I have no idea. I was struck in the head. I was—truthfully, I can't tell you." Eveningred did not tell the doctors in the emergency room that he had lost his hearing; asked why, he said, "I was in a lot of pain at the time. It was pretty—pretty hard to deal with." He noticed he could not hear out of the left ear that same day but did not go to the doctor until "a couple" of days later. The doctor looked in his ear with a scope and said "it was busted up, the hole in the eardrum." The doctor recommended seeing a different doctor and set up an appointment but Eveningred did not go to the appointment because he did not have the money for it. At the time of trial, every time his jaw moved, he heard "something snapping." He could not "hear real good" out of that ear but could hear if someone talked loud enough.

Ronald Searcy testified that he lived on 27th Avenue and did not know Eveningred or appellant. During his daily walk on June 1, 2012, near 29th and Boyles, he saw two young men in white undershirts run across Boyles on the opposite side of

3

29th. A woman came onto a porch saying, "Stop it! Don't do that. Stop it!" Searcy jogged around the corner and saw appellant standing over a man lying on the ground. Appellant was yelling something, as were the two boys, and Searcy said he was going to call the police. The man on the ground looked like he was trying to get up on his elbow. Searcy ran to the road, stopped a passing car and asked the driver to call 911. Returning, he saw that the man on the ground had blood on his head and running down his face. As the man stood up, Searcy, a vocational nurse, told him he needed to sit down. The man appeared pale and stunned, and asked, "What happened? What did I do?" Appellant had backed up and was yelling something to the effect of "I have daughters and he's been looking at them." A woman came out of the house and asked what happened; when Searcy said the man had been beaten up, she said, "Well, that's okay because he's talking about my daughters." The injured man kept trying to go talk to appellant and Searcy told him to stay away until the police sorted things out. Suddenly, appellant "took a swing," just missing the injured man's nose. Searcy held his heavy walking stick over his head, thinking or saying he was going to hit appellant over the head if he hit the man again. Appellant said, "Fuck you. I've got a .45 in my house. I'm going to go get it." Appellant ran into the house and Searcy ran to the street and told the arriving police officers about the gun. He recalled telling the police that appellant was not wearing a shirt.

Stormi Johnson, who lived diagonally across the street, had known Eveningred for about two years. She did not know appellant personally but saw him around the neighborhood. Standing on her front porch on the morning of June 1, she saw appellant and Eveningred talking. Eveningred shrugged or "put his hands up" and turned around, and appellant hit him from behind. Asked if appellant had an object in his hand, Johnson said, "I'm almost positive, because he had it in his hand when I ran over there. So I'm not sure from far if he had it, but he was too busy beating up Elton to pick up anything." The object looked like a "bike peg" and was bloody. Appellant first hit the back of Eveningred's head, then as Eveningred was on the ground, appellant repeatedly hit him in his side and back and kicked him in his face and sides. Appellant was yelling, "F-U,

4

nigger, stuff like that." Eveningred was bleeding and his eyes were "rolled in the back of his head." Johnson yelled for appellant to stop but he continued until Johnson's brother, Jayson Alvarez, ran over, at which point appellant jumped over the fence to his house, went inside and came back out, still yelling. Eveningred's neighbor from behind, who had pulled up in a truck, tried to help him get up but Eveningred was "just out. He was like limp. We couldn't get him up." Appellant's girlfriend and his mother came to the fence asking what was going on and Johnson said appellant was beating up Eveningred. Johnson denied that she threatened appellant's mother or that her brother threatened or spit on her. Johnson never saw Eveningred hit appellant, he just "turned around and got attacked."

Jayson Alvarez was on his front porch when he saw appellant hit Eveningred some six or seven times, then kick him four or five times. Eveningred was on the ground after the first time he was hit, and appellant "was hitting him all over the body, in his ribs, kicking him and stuff, in his face, and I don't know, a couple spots." It looked like appellant had an object in his hand, a bike peg or some metal object. Alvarez, shirtless and in his boxers, ran over, yelling that he was going to beat appellant up; appellant jumped over the fence saying something about getting a gun. Alvarez went back inside. He never saw Eveningred hit or shove appellant. When Alvarez got to the scene, his sister was already there. Appellant's mother and girlfriend ran outside after the fight ended. Alvarez acknowledged arguing with appellant's mother and girlfriend but denied threatening or spitting on appellant's mother.

Clearlake Police Officer Bobi Thompson, who had been employed by the Department for about a month, and training officer Mike Ray were dispatched to 16115 29th Avenue about 9:00 a.m. in response to a 911 call reporting a physical altercation between two males, one hitting the other with a metal pipe. Arriving at the scene, Thompson saw Eveningred standing in front of his house and his vehicle and appellant standing in front of his house. Eveningred had blood "all over his face," primarily coming from two cuts over his eyes. Eveningred seemed confused, not understanding what was going on. Medical personnel who arrived at the scene asked him if he knew

5

what day of the week and month it was; Eveningred did not, and said he thought it was a Saturday when in fact it was a Friday. The medical personnel determined he needed to be evaluated at the hospital. Thompson noticed that appellant had "apparent blood" on his knuckles and did not have any injuries. Thompson saw a metal pipe about five inches long and one inch in diameter in the bed of the pickup truck in Eveningred's driveway; she did not see a tarp. The officers asked Eveningred several times if he wanted to press charges and each time Eveningred said no, so appellant was not arrested. The next morning, Eveningred came to the police station and Thompson took photographs of his face. Appellant was arrested several months later, having left the state in the interim. At the preliminary hearing on April 22, 2013, Thompson observed that Eveningred had a light scar in his left eyebrow.

Otolaryngologist Dr. Jonathan Owens treated Eveningred on June 28, 2012, finding debris in his left ear canal and a perforated ear drum. The debris consisted of wax, blood or "a bit of both." Owens did not know how long ago the perforation had occurred. He testified that a perforation of the ear drum can causing hearing loss and can result from a sharp blow to the head. Asked whether a blow causing such an injury would generally be "to the area of the ear," Owens testified, "Typically, but not always. If someone sustains bleeding around the ear and fluid builds up behind the eardrum, it could perforate the eardrum. But more often than not, you would see injury to the area around the ear." A blow to the eye or eyebrow would "[n]ot generally" cause such an injury.

*Defense*

Appellant's mother, Brenda Riffle, testified that there had been hostility between Eveningred and appellant "at times." Eveningred had expressed a negative opinion of appellant before the June 1 incident and had stated that he felt appellant should wind up in jail. Riffle testified that Eveningred appeared to be hard of hearing prior to the incident, would "very often" ask her to repeat things she said to him and told her that he was hard of hearing.

6

Riffle testified that she saw "most" of the June 1 altercation; she came outside when she heard yelling and missed at most the first 30 seconds. Standing at the gate in her front yard, she saw Eveningred standing outside his car, holding a two to three foot steel pipe up in the air and yelling, aggressive and threatening. The pipe fell, and appellant went over and tried to hug Eveningred, saying, "[c]alm down. Calm down. It's cool." Eveningred shoved appellant, who went back, continuing to say " [i]t's cool" and "[c]alm down." Eveningred swung at appellant but Riffle's view was obscured by the pickup truck and she did not see whether he made contact. Appellant swung once and hit Eveningred in the eye, and Eveningred "went down." Riffle first testified that appellant hit Eveningred "[o]nce. Maybe twice. I think it was once." Shown her preliminary hearing testimony, in which she said appellant hit Eveningred two or three times, Riffle said it was "probably twice." She had testified at the preliminary hearing that appellant hit Eveningred while he was on the ground, but at trial said after thinking about it she was not sure he did. Riffle testified that when the altercation was over, Johnson and Alvarez hung over her fence, cursing and threatening her, and Alvarez spit on her. Riffle never saw appellant holding a metal pipe and he never lept over the fence.

Officer Thompson's report, dated the day after the incident, contained the following: " 'I asked [appellant] where the metal pipe was that he said [Eveningred] had had, and he told me [Eveningred] dropped it when he punched him. I then asked [Eveningred] where the metal pipe was he had had in his hand, and he pointed to a small metal pipe in the back of his truck and told me he threw it in the back of his truck.' " Thompson testified that she did not know which of the "he's" in the second sentence referred to Eveningred and which to appellant, did not know whether Eveningred was referring to himself or appellant having put the pipe in the truck and had no idea who Eveningred said was holding the pipe. She did not clarify the point because Eveningred was "really confused" and she was not sure what questions to ask, it being her first investigation of possible assault with a deadly weapon. Eveningred did not tell her he had a metal pipe in his hand when she took his statement, and she did not see him with one.

DISCUSSION

## I.

Appellant raises a number of arguments based on his belief that the evidence did not support a conclusion that he inflicted "great bodily injury" as required for the section 12022.7, subdivision (a), enhancement or "serious bodily injury" as required for conviction under section 243, subdivision (d).  In appellant's view, the only injury Eveningred suffered that could amount to "great" or "serious" bodily injury was the perforated eardrum, and that injury was not inflicted directly by him during the assault.  Instead, according to appellant, if the perforation was related to his conduct at all, it was at most proximately caused by the assault in that it developed over time due to Eveningred's failure to more promptly obtain medical treatment.

## A.

Appellant first contends the sentence enhancement for infliction of great bodily injury cannot stand because no rational trier of fact could have concluded he "personally inflicted" great bodily injury upon Eveningred.  Section 12022.7, subdivision (a), provides:  "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."  The statute defines "great bodily injury" as "significant or substantial physical injury."  (§ 12022.7, subd. (f).)  It must be a " 'substantial injury *beyond* that inherent in the offense.' "  (*People v. Cross* (2008) 45 Cal.4th 58, 64 (*Cross*), quoting *People v. Escobar* (1992) 3 Cal.4th 740, 746 (*Escobar*).)

"[W]hether a victim has suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by the jury.  (*Escobar, supra,* 3 Cal.4th at p. 750; *People v. Wolcott* (1983) 34 Cal.3d 92, 109.)"  (*Cross, supra,* 45 Cal.4th at p. 64.)  " 'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' "  (*People v. Davis* (1995) 10 Cal.4th 463, 509.)  We must

8

presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) 'The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on " 'isolated bits of evidence.' " [Citation.]' (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.)" (*People v. Medina* (2009) 46 Cal.4th 913, 919.)

With respect to Eveningred's perforated eardrum and hearing loss, appellant argues that there was insufficient evidence he caused the injury directly, by a blow that caused the eardrum to immediately perforate. At most, he maintains, the evidence shows he *might* have caused the injury *proximately*—that a blow might have caused bleeding which, over time, resulted in a build up of fluid behind the eardrum that caused a rupture because Eveningred did not seek medical treatment promptly enough.[2] He argues that the prosecutor improperly asked the jury to find the enhancement true on the theory that the injury would not have occurred "but for" the assault, which is insufficient to establish that appellant "personally inflicted" the injury.

A proximate cause of great bodily injury " 'is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the great bodily injury . . . and without which the great bodily injury . . . would not have occurred.' " (*People v. Bland* (2002) 28 Cal.4th 313, 335, 336 (*Bland*), quoting CALJIC No. 17.19.5.) " 'Proximately causing an injury is clearly different from personally inflicting an injury.' (*People v. Rodriguez* [(1999) 69 Cal.App.4th 341,] 351 [(*Rodriguez*)].)" (*Bland,* at p. 337.) " 'To "personally inflict" an injury is to directly cause an injury, not just to proximately cause it.' " (*Ibid.*)

---

[2] In appellant's words, the absence of evidence that he "did anything during the commission of the assault to actually, physically, and directly perforate the eardrum" required the prosecution and the jury to resort to probable cause speculation: the blows *may have* set in motion a chain of events that over time *may have* caused the perforation *if* (Eveningred having elected to forego medical intervention) internal bleeding around the ear structures *perhaps* occurred, followed *perhaps* by fluid build up behind the eardrum that eventually reached sufficient pressure to rupture the eardrum."

9

The cases appellant relies upon for the distinction between personal infliction and proximate cause are significantly different from the present one. In *Rodriguez, supra,* 69 Cal.App.4th at pages 345-346, the jury found that an alleged prior conviction was a "serious felony" due to the defendant having personally inflicted great bodily injury (§ 1192.7, subd. (c)(8)). We reversed because the trial court had instructed the jury in terms of proximate causation, permitting it to find the allegation true "if the . . . injury was a 'direct, natural and probable consequence' of [the defendant's] action, even if [the defendant] did not personally inflict the injury." (*Rodriguez*, at pp. 347-348.) The problem in *Rodriguez* was that it was not the defendant's action that caused the victim's injury: A police officer was knocked unconscious when he fell and hit his head on the ground or a lamppost while tackling the defendant, who had been attempting to escape on a bicycle. (*Id.* at p. 346.) The defendant "did not push, struggle or initiate any contact with the officer during the . . . incident[;]" instead, the officer "injured himself when he tackled" the . . . defendant. (*Id.* at p. 352.) Thus, although there was evidence that the defendant's conduct was a proximate cause of the officer's injury, there was no evidence the defendant "directly" or "personally inflicted" the injury. (*Ibid.*)

*People v. Cole* (1982) 31 Cal.3d 568 (*Cole*), also addressed an injury that was not inflicted by the defendant's own act. *Cole* held that a great bodily injury enhancement could not be imposed upon a defendant who "blocked the victim's escape and directed the attack but did not physically strike the victim": Only those "who perform the act that directly inflicts the injury" are subject to a section 12022.7 enhancement, not those who aid and abet or direct another to inflict the injury. (*Cole,* at p. 571.) *People v. Modiri* (2006) 39 Cal.4th 481, 486 (*Modiri*), held that a defendant who "physically joins a group attack, and applies force to the victim sufficient to inflict, or contribute to the infliction of, great bodily harm" may be found to have "personally inflicted" great bodily injury even if the defendant was not the "sole or definite cause of a specific injury." The *Modiri* court explained, "the statute calls for the defendant to administer a blow or other force to the victim, for the defendant to do so directly rather than through an intermediary, and for the victim to suffer great bodily injury as a result." (*Id.* at p. 493.)

10

Unlike the situations in *Rodriguez* and *Cole,* to the extent there is a causation issue in the present case, it is not whether appellant actually inflicted the blow that caused the injury, but whether the blow appellant personally inflicted caused the injury sufficiently directly if Eveningred's eardrum did not perforate during the assault. Appellant's authorities are not illuminating on this point. That the full extent of an injury develops over time, however, does not necessarily mean it was not "personally inflicted." In *People v. Warwick* (2010) 182 Cal.App.4th 788, 790-791, the defendant concealed her pregnancy and the birth of her child, who was discovered a number of hours later only partially covered by a blanket. By this time, the baby was hypothermic to a life-threatening degree and had dead brain cells probably caused by the hypothermia and lack of oxygen. (*Id.* at pp. 791-792.) The defendant's "actions and inaction were the direct as well as proximate cause of her child's injuries." (*Id.* at pp. 793-794.) In *Cross, supra,* 45 Cal.4th at pages 60-61, the 13-year-old victim became pregnant as a result of sexual intercourse with the defendant, then at his encouragement underwent a late-stage surgical abortion near the end of her second trimester. *Cross* held that the pregnancy, without medical complications and resulting from nonforcible sexual conduct, supported a finding of great bodily injury. The *Cross* court did not address causation with respect to the pregnancy; the issue was whether the pregnancy amounted to great bodily injury. But the holding was based on consideration of the impact on the 13-year-old's body of carrying a fetus for 22 weeks, not just the "injury" inflicted at the time of intercourse. (*Id.* at p. 66.) When the court did consider causation, it was in holding that the abortion could not support the great bodily injury enhancement because it was not directly performed by the defendant. (*Id.* at p. 67.)

Here, there was ample evidence that appellant directly caused Eveningred's injury. The prosecution offered the jury two theories as to how this occurred. The first was that one of appellant's blows during the assault immediately caused the eardrum to perforate. The other, the basis of his proximate cause argument, was that one of the blows caused internal bleeding that led to a build up of fluid in the ear canal, ultimately causing the eardrum to rupture. Appellant dismisses the first theory with the statement that the

11

evidence showed he inflicted "two blows to Eveningred's forehead, but none to the ear, the side or the back of the head" and "Eveningred himself could not say he was struck on the ear." He dismisses the second as improperly equating personal infliction of great bodily injury with an action that resulted in injury only after the passage of time and, in appellant's view, Eveningred's failure to obtain proper medical treatment. Neither argument is persuasive.

There is no basis for appellant's suggestion that he inflicted only two blows to Eveningred's forehead and none to his ear or the side or back of his head. Jackson saw appellant hit Eveningred "a lot," specifically including the back of his head, and Alvarez saw appellant hit Eveningred some six or seven times, including in the face. That Eveningred sustained two cuts to his forehead supports a conclusion that appellant struck him at least twice, but not that appellant inflicted only these two blows. The witnesses described a beating in which appellant hit and kicked Eveningred multiple times in multiple places. That no witness specifically saw a blow strike the area of the victim's ear is not dispositive if other evidence supports the conclusion that this occurred. Such evidence is supplied by Eveningred's testimony that he noticed the loss of hearing in his left hear on the day of the assault and the eardrum perforation was diagnosed a couple of days later. Dr. Owens testified that a blow to the head could cause an eardrum to perforate either directly or as a result of a buildup of blood and fluid behind the eardrum. While his testimony indicated that it would be more common for a perforation to result from a direct blow to the ear, it also established that a blow to another part of the head could be responsible if it caused bleeding and fluid buildup behind the eardrum. This testimony, combined with the witnesses' description of a beating in which multiple blows were inflicted and Eveningred's testimony that he noticed a new loss of hearing the day of the assault, supports a conclusion that if the eardrum did not actually rupture during the assault, at the very least the assault directly caused bleeding and fluid buildup that

12

interfered with Eveningred's hearing.[3]  The evidence was sufficient to support the finding that appellant inflicted great bodily injury during the assault.

Appellant attempts to show that the prosecution improperly relied upon a proximate cause theory with respect to the great bodily injury enhancement by pointing to the prosecutor's statement in closing argument that "it would be quite the coincidence" if the ear injury "had nothing to do with this attack."  To appellant, this remark demonstrates that the most the prosecutor could argue based on the evidence was that the injury "must have had *something* to do with the attack."  But this was not the prosecutor's argument.  The remark appellant focuses upon was made in the course discussing the charge of battery causing serious bodily injury.  After noting that the definition of "serious bodily injury" included loss of consciousness and protracted loss or impairment of a function of any bodily member or organ—in this case, it was argued, that Eveningred was "knocked out cold" and "can't hear anymore" —the prosecutor argued:  "[Y]ou heard testimony from the doctor and from Mr. Eveningred himself—from the doctor that there was blood and wax debris in the ear and a perforation of the eardrum, which is consistent to a blow to the head, and blood buildup behind the eardrum.  And the

---

[3] In April 2014, appellant filed a motion for judicial notice of information about the causes of eardrum perforation provided on the internet web sites of several medical organizations—the American Academy of Otolaryngology, the Mayo Clinic, and MedlinePlus (United States National Institutes of Health).  Respondent did not oppose the motion, and we granted it.  With respect to causation by a blow to the head, the web sites indicate that perforation can occur, "[i]f the ear is struck directly," "[w]ith a skull fracture," with "[s]evere injury, such as skull fracture" that "may cause the dislocation or damage to middle and inner ear structures" and with "[i]njury to the ear (such as a powerful slap or explosion)."  Appellant argues that only these "few physical traumas" can rupture an eardrum and that the evidence fails to show a direct blow to the victim's ear or a skull fracture.  Respondent's brief belatedly asserts that appellant's efforts to add new material to the record for consideration regarding sufficiency of the evidence are improper, citing *McDaniel v. Brown* (2010) 558 U.S. 120, 130-131 [court reviewing for sufficiency of evidence must consider all evidence admitted by trial court, regardless of whether it was admitted erroneously].  Regardless, none of the cited sources purport to provide an exhaustive list of causes of eardrum perforation.  As we have said, the evidence supports a conclusion that appellant inflicted a sufficiently serious blow to cause the eardrum rupture.

13

defendant testified that the hearing loss came immediately after the attack and he hadn't had problems hearing out of that ear before. So it would be quite the coincidence if that hearing loss and that injury and that blood had nothing to do with this attack, as would be proposed by the defense." The clear point of this argument was simply to refute the defense evidence that Eveningred's hearing loss predated and therefore was unrelated to the attack.

"Personal infliction" was not a part of this discussion. When the prosecutor turned to the great bodily injury enhancement, she simply stated that if the jury found appellant guilty of assault in count one, it "must then decide whether we've proven that the defendant personally inflicted great bodily injury on Mr. Eveningred. And that again means an injury that is greater than minor or moderate harm." The prosecutor had previously discussed great bodily injury in connection with the assault charge, which required proof of force likely to produce great bodily injury. In that context, the prosecutor explained that she had to prove appellant "did an act that, by its nature, would directly and probably result in the application of force to a person" and that "the force was likely to produce great bodily injury." The prosecutor defined great bodily injury as "injury that is greater than minor or moderate harm" and stated, "Hearing loss qualifies. Scar on the face, the kinds injuries that were sustained by Mr. Eveningred that day, it is the People's position that they are a great bodily injury."

Noting the statement in *Modiri* that "*Cole* stands for the modest proposition that a defendant personally inflicts great bodily harm only if there is a direct physical link between his own act and the victim's injury" (*Modiri*, *supra*, 39 Cal.4th at p. 495), appellant argues that link is missing here. According to appellant, if his actions played any role in Eveningred's injury, "it was the intervening causes, including the victim's silence and inaction, that may well have allowed the injury to develop after the assault had ended."

As a factual matter, appellant's argument ignores Eveningred's testimony that he noticed his loss of hearing on the day of the assault and the eardrum was found to be perforated only a couple of days later. As a legal matter, appellant offers no support for

14

his suggestion that he cannot be viewed as having personally inflicted an injury that was initiated by his personal assault and increased in severity over the ensuing days because the victim *might* have been able to mitigate the severity of the injury through medical treatment.[4] Indeed, the premise of appellant's argument is mistaken. In appellant's view, if he did anything during the assault to begin the process that led to the ruptured eardrum, he did not "directly" inflict the injury because Eveningred's failure to obtain medical treatment more quickly was an "intervening cause." But if appellant's conduct began the process, it could only have been through *direct* infliction of some injury; any delay in obtaining treatment might have failed to stop the progression of that injury but it did not render that progression any less direct. Appellant "cannot complain because no force intervened to save him from the natural consequence of his criminal act." (*People v. McGee* (1947) 31 Cal.2d 229, 243 [delay in medical treatment that might have saved victim's life would not relieve defendant of criminal responsibility for death].)

Further, if Eveningred's decision to delay medical treatment contributed to the degree of injury he suffered, this would not negate appellant having directly and personally caused the injury. A defendant may be found to have personally inflicted great bodily injury even when the victim plays a direct role in causing it. *People v. Martinez* (2014) 226 Cal.App.4th 1169, 1172-1173, upheld great bodily injury enhancements attached to the defendant's convictions of selling, transporting or furnishing a controlled substance. The victim had died of an overdose after the defendant gave her methadone and hydrocodone during an evening of drinking. (*Id.* at pp. 1173-1175, 1177-1178.) *Martinez* rejected the defendant's argument that the direct cause of death was not his furnishing the drugs but the victim's voluntary ingestion. (*Id.* at pp. 1185-1186.) "Simply put, appellant's argument that the enhancement is inapplicable because [the victim] made a volitional choice that directly caused her death is unavailing. More than one person may be found to have directly participated in inflicting a single

---

[4] There was no evidence that Eveningred's condition would or could have been improved if he had mentioned his hearing loss in the emergency room or had seen the otolaryngologist sooner.

15

injury. . . . As our Supreme Court explained in . . . *Modiri*[, *supra*,] 39 Cal.4th 481, while construing the identical phrase 'personally inflicts great bodily injury' in . . . section 1192.7, subdivision (c)(8): *'The term "personally," which modifies "inflicts" . . . does not mean exclusive* here. This language refers to an act performed "in person," and involving "the actual or immediate presence or action of the individual person himself (as opposed to a substitute, deputy, messenger, etc)." [Citation.] Such conduct is "[c]arried on or subsisting between individual persons directly." [Citations.] Framed this way, the requisite force must be one-to-one, but does not foreclose participation by others. [¶] In short, nothing in the terms "personally" or "inflicts," when used in conjunction with "great bodily injury" . . . necessarily implies that the defendant must act alone in causing the victim's injuries.' ([*Modiri*], at p. 493, italics added [in *Martinez*].)" (*People v. Martinez, supra,* 226 Cal.App.4th at pp. 1185-1186, fn. omitted.)

The great bodily injury enhancement is also supported by the evidence that Eveningred was rendered unconscious by the assault. Appellant appears to concede that unconsciousness constitutes great bodily injury but argues that the evidence does not support a conclusion that Eveningred ever actually lost consciousness. Appellant notes that Eveningred could only speculate on this point, as indicated by his response—"I guess I was"—to the question whether he was "knocked out" during the assault. According to appellant, the evidence showed only that Eveningred was disoriented, and that he was standing on his own, albeit confused, when the police arrived "almost immediately" after the assault ended.

"[L]oss of consciousness" is one of the statutory examples of the "serious impairment of physical condition" that constitutes "[s]erious bodily injury" for purposes of battery with infliction of serious bodily injury. (§ 243, subds. (d), (f).) The terms " 'serious bodily injury' " and " 'great bodily injury' " are " ' "essentially equivalent." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 143, fn. 2, quoting *People v. Burroughs* (1984) 35 Cal.3d 824, 831; *People v. Hawkins* (1993) 15 Cal.App.4th 1373, 1375 [terms have "substantially the same meaning].) It follows that unconsciousness can constitute great bodily injury. Eveningred's testimony that he "guessed" he was knocked out, together

16

with his response that he "remember[ed] getting off the ground" when asked if he remembered hitting the ground after appellant hit him in the head, strongly suggests at least a brief period of loss of consciousness. Johnson testified that Eveningred's eyes were "rolled in the back of his head" and, when they tried to help him stand up, he was "just out. He was like limp."

Appellant offers a definition of "unconsciousness" from MedlinePlus, a website produced by the National Institutes of Health's National Library of Medicine, which equates "unconsciousness" with a "coma": "Unconsciousness is when a person is unable to respond to people and activities. Often, this is called a coma or being in a comatose state." But MedlinePlus also defines "coma" as "a deep state of unconsciousness." (MedlinePlus <http://www.nlm.nih.gov/medlineplus/coma.html>.) We are aware of no case law equating the degree of unconsciousness required to constitute great or serious bodily injury with the "deep state of unconsciousness" (*ibid.*) or "profound unconsciousness" (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 227) that comprises a "coma." On the contrary, statutory definitions clearly distinguish these states. For example, section 243, subdivision (d), prescribes punishment of two, three or four years for a battery with infliction of serious bodily injury (defined, as we have said, as including "loss of consciousness." (§ 243, subd. (f)(4).) Section 12022.7, subdivision (a), calls for a three-year enhancement for infliction of great bodily injury in the commission of a felony or attempted felony. But in section 12022.7, subdivision (b), the Legislature requires a five-year enhancement for infliction of great bodily injury "which causes the victim to become comatose due to brain injury. . . ." Unconsciousness of apparently short duration has been viewed as supporting a finding of serious bodily injury. (*People v. Wade* (2012) 204 Cal.App.4th 1142, 1146 [victim "blacked out" while being choked and did not know how long she was unconscious].)

As our supreme court has observed, " ' "A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description." ' " (*Escobar, supra,* 3 Cal.4th at p. 752, quoting *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 836; *People v. Clay* (1984) 153 Cal.App.3d 433, 460.) Where to

17

draw that line is for the jury to decide." (*Cross*, *supra*, 45 Cal.4th at p. 64.)  Here, evidence supports its conclusion.

## B.

Appellant's second contention, that the evidence was insufficient to support his conviction of battery with infliction of serious bodily injury, falls with his first. Appellant's argument, as with his challenge to the great bodily injury enhancement of his assault conviction, is that the evidence did not establish the "physical link" proving he "inflicted" rather than simply "caused" the injury to Eveningred's eardrum, that any causal connection was speculative, and that Eveningred's other injuries did not amount to serious bodily injury as defined in section 243, subdivision (f).  For the reasons discussed above, these arguments are not persuasive.

## C.

Nor can appellant prevail on his argument that the trial court erred in instructing the jury.  Appellant contends the court had an obligation to instruct sua sponte that "proximately caused" has a different legal meaning than "personally inflict" or "inflict" and is insufficient to establish the elements of section 12022.7, subdivision (a), requiring personal infliction of great bodily injury, and of section 243, subdivision (d), requiring infliction of serious bodily injury.  Appellant maintains such instructions were required due to the "predominance of evidence of proximate causation."  As we have explained, however, appellant's conceptualization of causation in this case is misguided.  The only evidence that appellant caused the injury to Eveningred's eardrum is evidence that he did so personally and directly, whether by a blow causing an immediate rupture or a blow causing bleeding and fluid buildup that resulted in a rupture.

The cases appellant relies upon are inapposite.  *Bland*, *supra,* 28 Cal.4th at pages 333-334, involved an enhancement requiring both "personal infliction" and "proximate cause" components:  Under section 12022.53, subdivision (d), an enhancement is to be imposed when the defendant "intentionally and personally discharged a firearm and proximately caused great bodily injury, as defined in . . . [s]ection 12022.7, or death, to any person other than an accomplice . . . ."  (*Bland*, at p. 334.)  The defendant and

another individual shot into a vehicle, killing one victim and injuring two, and it was not clear whose shots hit the two injured victims. (*Id.* at p. 318.) The trial court instructed in the language of the statute but did not define proximate cause; the *Bland* found error because the term "proximate cause" has "a meaning peculiar to the law" that a jury would have difficulty understanding without guidance. (*Id.* at p. 334.) The error was harmless, however, because it was not necessary to establish that the defendant's shot hit a victim: The enhancement statute required that the defendant personally fire the gun but only that he proximately cause injury, that is, that his "personal discharge of a firearm" was a "substantial factor contributing to the result." (*Id.* at p. 338.)

In *Rodriguez, supra,* 69 Cal.App.4th at pages 346-347, the trial court instructed the jury that "[t]o constitute the personal infliction of great bodily injury there must be in addition to the injury an unlawful act which was a cause of such injury. [¶] Criminal law has its own particular way of defining cause. A cause of injury is an act that sets in motion a chain of events that proceed a direct, natural and possible consequence of the act, the injury, and without which the injury would not occur." The last sentences of this instruction incorporated the definition of proximate cause, allowing the jury to find that the defendant "personally inflicted" the victim's injury if it was a direct, natural and probable consequence of the defendant's action even if the defendant did not personally inflict it. (*Id.* at pp. 346-347.) As earlier discussed, the evidence in *Rodriguez* supported a conclusion that the defendant proximately caused the victim's injuries but there was no evidence he personally inflicted them. (*Id.* at p. 352.)

Here, in contrast, the term "proximate cause" did not appear in the prosecutor's argument or the jury's instructions, and the evidence did not support a conclusion that appellant caused Eveningred's injuries in any way other than personally and directly. The jury was instructed that the prosecution was required to prove appellant personally inflicted great bodily injury. Further instruction on the meaning of this requirement was not required. " ' "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning." [Citations.]' (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012.) Here, the

19

meaning of the statutory requirement that the defendant *personally inflict* the injury does not differ from its nonlegal meaning.  Commonly understood, the phrase 'personally inflicts' means that someone 'in person' (Webster's 7th New Collegiate Dict. (1970) p. 630), that is, directly and not through an intermediary, 'cause[s] something (damaging or painful) to be endured.'  (*Id.* at p. 433.)"  (*Cross, supra,* 45 Cal.4th at p. 68.)

**D.**

The last of appellant's arguments related to proximate cause is that the jury's general verdict on the great bodily injury enhancement was unconstitutionally vague because one of its possible bases—proximate causation—was unlawful.  Appellant acknowledges that the jurors generally would not be required to agree unanimously on which condition constituted great bodily injury (*People v. Robbins* (1989) 209 Cal.App.3d 261, 264-265 [unanimity not required as to which injuries were great bodily injury under section 12022.8]; *People v. Briscoe* (2001) 92 Cal.App.4th 568, 591-592 [unanimity on underlying facts/theories of guilt not required]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1185 [unanimity on theory of guilt not required].)  Because he believes the prosecutor relied upon an unlawful theory of guilt, however, appellant argues the verdict cannot stand because it is impossible to discern whether the jury relied upon the unlawful theory.  (*Griffin v. United States* (1991) 502 U.S. 46, 59.) Given our conclusion that the prosecution did not rely upon an unlawful proximate cause theory, this argument is also unavailing.

**II.**

Appellant received an upper term sentence after the trial court found several factors in aggravation and none in mitigation.  He contends the trial court failed to comply with the rules governing sentencing by arbitrarily disregarding substantial evidence of a significant mitigating factor recognized under the California Rules of Court[5]—mental illness.

---

[5] Further references to rules will be to the California Rules of Court.

Consistent with the probation department's recommendation, the court found three aggravating factors: appellant "engaged in violent conduct that indicates a serious danger to society (rule 4.421(b)(1)); appellant's "prior convictions . . . are numerous" (rule 4.421(b)(2)); and appellant's "prior performance on probation . . . was unsatisfactory" (rule 4.421(b)(5)). The probation report reflects misdemeanor convictions for assault, aggravated menacing and "concealed weapon" (knife) in 1995; for carrying a concealed weapon and aggravated menacing in 2000; for assault causing bodily injury on a family member in 2003; for disturbing the peace (reduced by plea from charge of spousal/cohabitant abuse) in 2008; for battery and for spousal abuse, on separate occasions, in 2009; and for spousal/cohabitant abuse in 2010. Appellant had four violations of probation after the 2009 offenses, ultimately receiving a 180-day jail sentence when probation was permanently revoked. The 2010 conviction resulted in a two-year prison sentence, and the present offense occurred just after appellant was released in 2012.

The defense submitted a report from clinical and forensic psychologist John Podboy, who examined appellant in November 2013. Dr. Podboy reported that appellant received social security benefits due to a "major mental illness, which records indicate is possibly schizophrenia." Appellant indicated that he had been taking the antipsychotic medication Navane for three to four weeks but had stopped taking it two days before the evaluation because it affected his eyesight. He preferred a medication regimen of Haldol, Seroquel and Buspar, which he said had previously been prescribed for him. According to Podboy's report, appellant was hospitalized at age 10 for being suicidal and delusional, was either in a psychiatric hospital or in a juvenile correctional facility between the ages of 11 and 18, and told a prior evaluator that he was a paranoid schizophrenic. His most recent psychiatric hospitalization was from December 24, 2010, to May 11, 2011.

Dr. Podboy stated that appellant's history "would place him in the category of considerable developmental problems. [¶] However, from a clinical perspective, he did not present to me as a paranoid schizophrenic. . . . [¶] His symptoms of major mental illness are not pronounced, at least at the time of my examination, perhaps due to the fact

21

that Navane has a considerable half-life. . . . [¶] . . . [¶] However, the chronicity of this individual's adjustment difficulties suggest that he is in need of ongoing psychological and psychiatric treatment. [¶] Some downturn in his acting out based in part on his age is anticipated as a statistical probability." Appellant "presents as someone who does not fit neatly into either category—that of chronic criminality or someone who is purportedly mentally ill. He is an individual with longstanding personality problems . . . ." Podboy found appellant to be "a highly immature and inadequate male who does not have the ability to function successfully, primarily in relationships with women but obviously in regard to his assault on his former neighbor, with men, on occasion. [¶] . . . He will certainly require some type of supervision for an extended period of time before he would be able to make a reasonable adjustment to the community at large. [¶] He needs to be on a constant regimen of psychotropic medications. . . . [I]t is highly unlikely given his history of drug abuse that he can function without some sort of psychoactive intervention, preferably not marijuana, but a low-dosage antipsychotic along with a tranquilizing medication. He does appear to be very anxious about many things."

With respect to sentencing, Podboy stated, "Given the realignment philosophy currently extant in California Corrections, a marginal and inadequate male such as [appellant] would preferably be managed at the county level after a period of incarceration. [¶] Consequently, he would appear to be a reasonable candidate for adequate and close local probation supervision. [¶] In my 40 years as a forensic psychologist, [appellant] ranks as far less dangerous than many others with similar convictions." If sentenced to prison, Podboy suggested that appellant be evaluated for placement in protective custody or "mental health module," as he apparently had been when screened at San Quentin for his spousal abuse conviction.

At the sentencing hearing, defense counsel urged the court to view appellant's mental health issues as a factor in mitigation. Rule 4.423(b)(2) lists as a mitigating factor, "[t]he defendant was suffering from a mental or physical condition that significantly reduced culpability for the crime." The prosecutor urged, "The defendant

22

reportedly suffers from a mental defect, but there's no evidence that the crime was committed because of that."

The trial court's sentencing decision is reviewed for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) "The trial court's sentencing discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.' " (*Ibid.*, quoting *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 978.) Relevant criteria enumerated in the sentencing rules "will be deemed to have been considered unless the record affirmatively reflects otherwise." (Rule 4.409.) The court is required to specify reasons for its sentencing decision but is "not . . . required to cite 'facts' that support its decision or to weigh aggravating and mitigating circumstances." (*Sandoval,* at p. 847.)

The trial court read Dr. Podboy's report at the outset of the sentencing hearing and, as we have said, both defense counsel and the prosecutor referred to appellant's mental condition in their arguments at the hearing. The report documented appellant's mental health history and addressed his need for treatment, as well as expressing Dr. Podboy's opinion that appellant was "far less dangerous than many others with similar convictions." The report did not, however, present appellant's psychiatric state as reducing his culpability for the offense. Indeed, the report cited the assault on Eveningred as demonstrating that appellant "does not have the ability to function successfully" in relationships with men, as well as in relationships with women.

The court made clear that it believed the upper term was appropriate because of appellant's violent conduct in the present incident, resulting in the victim being seriously hurt, and lengthy history of violent offenses. The court was not required to explain its rejection of appellant's mental illness as a mitigating factor and we find no abuse of discretion in its decision to impose the upper term.

## DISPOSITION

The judgment is affirmed.

23

                    _____

                    Kline, P. J.

We concur:


_____

Richman, J.


_____

Stewart, J.

*People v. Syvertson* (A140480)

24